J-S42022-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ELIZABETH MAE FAIR | |
| Appellant | No. 1411 WDA 2015 |

Appeal from the Judgment of Sentence March 19, 2015
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s): CP-65-CR-0000587-2013

BEFORE: SHOGAN, J., OTT, J., and FITZGERALD, J.[*]

MEMORANDUM BY OTT, J.:                          **FILED OCTOBER 13, 2016**

Elizabeth Mae Fair brings this appeal from the judgment of sentence, imposed on March 19, 2015, in the Court of Common Pleas of Westmoreland County. Fair was sentenced to serve an aggregate term of five to 10 years' imprisonment followed by a five year probationary term, after she was convicted by a jury of conspiracy to commit aggravated assault and endangering the welfare of children, and endangering the welfare of children.[1] The victim in this case is the infant daughter of Fair and her co-defendant, Christopher Lawrence Peterman.[2] Fair challenges the sufficiency

_____

[*] Former Justice specially assigned to the Superior Court.

[1] *See* 18 Pa.C.S. §§ 903(a)(1) and 4303, respectively.

[2] Peterman was tried with Fair and convicted of aggravated assault, conspiracy to commit aggravated assault and endangering the welfare of
*(Footnote Continued Next Page)*

of the evidence, the weight of the evidence, and the discretionary aspects of her sentence — all with regard solely to her conviction for conspiracy to commit aggravated assault.[3]  Based upon the following, we affirm on the basis of the trial court's sound opinion.

The Honorable Meagan Bilik-DeFazio has set forth the procedural history and an extensive discussion of the facts of this case and, therefore, we need not restate them here.  **See** Trial Court Opinion, 8/17/2015, at 1–15.  Briefly, the three-month old victim suffered numerous severe injuries while under the care of Peterson and Fair.[4]  The injuries were discovered after Peterson and Fair brought the victim to Westmoreland Hospital on October 20, 2012.  An emergency room doctor called Dr. Rachel Berger, a pediatrician and Division Chief for the Division of Child Advocacy at

_(Footnote Continued)_ _____

children, and endangering the welfare of children.  **See** 18 Pa.C.S. §§ 2702(a)(1), 903(a)(1) and 4303, respectively.  Peterman has filed an appeal which is listed consecutively to this appeal. **Commonwealth v. Peterman**, 1412 WDA 2015, J-S42023-16.

[3] The trial court did not order Fair to file a concise statement of errors complained of on appeal, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b).  On September 30, 2015, the trial court filed a Rule 1925(a) statement, relying on its opinion filed August 17, 2015, which accompanied the order denying Fair's post-sentence motions.

[4] On July 20, 2012, the victim was born prematurely, and was hospitalized after her birth.  Fair and Peterman learned how to perform CPR and use the oxygen and monitor the victim required.  On September 24, 2012, the victim was discharged from the hospital with a pulse oximeter, which kept track of her oxygen levels, and an A&B monitor, which kept track of her heart rate and breaths.  **See** Trial Court Opinion, 8/17/2015, at 2 n.1.

Children's Hospital of Pittsburgh, who was on-call for the Child Protection Team, for consultation regarding child abuse concerns. The charges against Fair arose following an investigation by state police upon receiving a report from Westmoreland County Children's Bureau regarding suspected child abuse by Peterman and Fair.

Judge Bilik-DeFazio has provided a 24-page opinion that fully addresses the issues raised in this appeal. *See* Trial Court Opinion, 8/17/2015, (explaining: (1) There was sufficient evidence that Fair entered into an agreement with Peterman to commit aggravated assault, where forcible trauma was inflicted upon the victim, where Fair and Peterman always maintained they were always the victim's only caretakers and the victim was a healthy and fracture-free infant when she left the hospital, where Fair and Peterman were aware the victim was having multiple "medical episodes" that required CPR between October 17–20, 2012, and told each other about the episodes but decided not to seek medical care, and where Dr. Berger[5] testified that the victim's multiple rib fractures could not have been the result of CPR performed on her, that the history of the fall from the bassinet could not account for all the victim's injuries, and that it would not have been possible for Fair and Peterman to be unaware that the

_____

[5] Dr. Rachel Berger, a pediatrician and Division Chief for the Division of Child Advocacy at Children's Hospital of Pittsburgh, testified as an expert in pediatrics and child abuse. Trial Court Opinion, 8/17/2015, at 4.

victim's forearms and femur were fractured or that the victim was in a tremendous amount of pain; (2) Fair's acquittal on the aggravated assault charge did not preclude a conviction for conspiracy to commit aggravated assault, and the court does not believe the jury's verdict is so contrary as to shock the court's sense of justice, and (3) Fair's sentence of 5–10 years' imprisonment on Count 2, conspiracy to commit aggravated assault, which falls above the aggravated range,[6] is warranted under the facts and circumstances of this case, and the reasons were set forth on the record at the time of sentencing.)

Based on our review, we find no error of law or abuse of discretion by the trial court. Furthermore, in light of the trial court's thorough and cogent discussion, no further elaboration is warranted by this Court. Accordingly, we adopt the trial court's opinion authored in support of its decision to deny Fair's post-sentence motions as dispositive of the issues raised in this appeal.[7]

Judgment of sentence affirmed.

_____

[6] Fair had a prior record score of zero, and the applicable offense gravity score is ten: The standard range is 22–36 months, minus or plus 12 months for the mitigated and aggravated ranges. The statutory maximum was 20 years' imprisonment. *See* 18 Pa.C.S. § 1103.

[7] In the event of further proceedings, parties are directed to attach a copy of the trial court's opinion to this memorandum.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/13/2016

Received 01/26/2016 Superior Court Western District

Filed 01/22/2016 Superior Court Western District
1411 WDA 2015

IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA
– CRIMINAL DIVISION


COMMONWEALTH OF PENNSYLVANIA )
)
vs. )    NO.    587 C 2013
)
ELIZABETH MAE FAIR )


**OPINION AND ORDER OF COURT**

The above-captioned case is before this Court for disposition of Defendant's Post-Sentence Motions filed pursuant to Pennsylvania Rules of Criminal Procedure 720(B). The defendant, Elizabeth Mae Fair (hereinafter "Defendant") was charged with the following crimes:

Count 1- Aggravated Assault, 18 Pa.C.S.A. § 2702(a)(1), 1st degree felony.

Count 2- Criminal Conspiracy – Aggravated Assault and/or Endangering the Welfare of Children, 18 Pa.C.S.A. § 903(a)(1), 1st degree felony.

Count 3- Endangering the Welfare of Children, 18 Pa.C.S.A. 4304(a)(1), 3rd degree felony.

The charges stem from an investigation by Pennsylvania State Police (hereinafter "PSP") Trooper Todd Adamski (hereinafter "Tpr. Adamski") into the report received from Westmoreland County Children's Bureau (hereinafter "WCCB") regarding suspected child physical abuse of Defendant and Co-Defendant, Christopher Lawrence Peterman's (hereinafter "Peterman"), infant, E.P. The initial report indicated that WCCB received a report from ChildLine regarding an infant that was transported to Westmoreland Hospital for treatment, and, because of the injuries, the infant was then flown via helicopter from Westmoreland Hospital to Children's Hospital of Pittsburgh (hereinafter "CHP"). Tpr. Adamski spoke with E.P.'s attending doctor, who informed him of E.P.'s injuries. Tpr. Adamski was advised that both of E.P.'s right and left ulna bones were broken and that they were healing at different stages, her right femur was broken at an uncommon location, she had multiple rib fractures, a pulmonary contusion caused from trauma, laceration of her spleen, contusions on both lungs, a right temporal skull fracture, and that, her sustained injuries were near fatal. After speaking with E.P.'s doctors and her nurse, a WCCB caseworker, and both of E.P.'s parents, who provided statements, Tpr. Adamski obtained and executed a search warrant of the family's residence.

As a result of his investigation, Tpr. Adamski filed the above-referenced charges against Defendant. Following Defendant's arrest, Magisterial District Judge Jason Buczak conducted a Preliminary Hearing on February 7, 2013, and held the case for court. On April 9, 2013, the Commonwealth filed a Notice to Consolidate with the case of Commonwealth v. Christopher Lawrence Peterman, 600 C 2013. On April 18, 2013, Defendant's Petition for Nominal Bond was DENIED by Judge John E. Blahovec. Defendant's second Petition for Nominal Bond was DENIED by Judge Blahovec on December 2, 2013. Jury selection commenced on December 1, 2014, and a trial by jury was conducted on December 2, 2014, through December 5, 2014.

On December 5, 2014, Defendant was found guilty of Count 2, Criminal Conspiracy to Commit Aggravated Assault and Endangering the Welfare of Children, and Count 3, Endangering the Welfare of Children. Defendant was found not guilty of Count 1, Aggravated Assault. At that time, bond was revoked, a Pre-Sentence Investigation was ordered, and a Sentencing Hearing was to be scheduled within ninety (90) days.

On March 19, 2015, after a Sentencing Hearing was held, at Count 2, Defendant was sentenced to a state correctional institution for a period of not less than five (5) years nor more than ten (10) years, followed by five (5) years consecutive state probation. At Count 3, Defendant was sentenced to a period of not less than eighteen (18) months nor more than thirty-six (36) months, concurrent to Count 2. Defendant was determined to be RRRI eligible at fifty (50) months and was given credit for time served. Defendant timely filed the following Post-Sentence Motions:

I.    Motion for Judgment of Acquittal at Count 2: Conspiracy.

II.    Motion to Modify Sentence.

III.    Weight of the Evidence.

## FACTS

At approximately 3:55 p.m., on October 20, 2012, Westmoreland Hospital Emergency Department Registered Nurse Carolyn Yoder began treating three (3) month old E.P.[1] when she was brought into the

---

[1] On July 20, 2012, 30 weeks into Defendant's pregnancy, E.P. was born premature at Westmoreland Hospital. N.T. December 1-5, 2014, p. 609-610 (To decrease the length of each citation, the notes of testimony regarding the trial will hereafter be referred to as "N.T."). As a result of her prematurity, E.P.'s lungs and brain were underdeveloped and thus E.P. was transported to West Penn Hospital, where she stayed for a month and a half. N.T. 610-611. E.P. was then transferred to the Children's Home where Defendant and Peterman were able to stay with E.P. while they learned how to use the oxygen and monitors that E.P. required. N.T. 611. E.P. was discharged home to Defendant and Peterman from the Children's Home

emergency room by her parents, Defendant and Peterman. N.T. December 1-5, 2014, 343-344.[2] Ms. Yoder testified that both parents were present and provided the information that E.P. was sick during the day, that the parents had done CPR on E.P. twice, that the bassinet had fallen on E.P., and the parents brought E.P. to the hospital. N.T. 345. Ms. Yoder observed that E.P. was very pale and dusky, that her lips were blue, she had a bluish/white tint to all of her extremities, she was cool to the touch, her oxygen saturation was in the 80's,[3] and that, although E.P. was trying to cry, it was a very weak cry. N.T. 345-346. Ms. Yoder recalled that both parents stayed off in the distance from the hospital staff which, based on her experience, was abnormal. N.T. 346. Admittedly though, Ms. Yoder did not know Defendant and Peterman prior to this incident and Ms. Yoder testified that it wouldn't be unusual for parents who love a child to be in shock when their baby is very sick. N.T. 351-352. Ms. Yoder testified that, when the hospital staff was undressing E.P., when she noticed that E.P.'s right thigh was at least two (2) to three (3) times more swollen than the left thigh, one of the parents remarked that E.P.'s diaper may have been too tight. N.T. 348.

Shortly after 4:09 p.m., Westmoreland Hospital Emergency Department Physician Dr. John Peoples[4] joined in the treatment of E.P. N.T. 391-392. Dr. Peoples testified that E.P. immediately presented with difficulty in breathing and, due to the severity of E.P.'s injuries, Dr. Peoples was only able to speak to Defendant and Peterman for a short period of time.[5] N.T. 392. Defendant and Peterman provided a brief birth history, Peterman relayed concern regarding a bassinet collapse four (4) days prior, and Defendant advised that, on that day, four (4) days prior, E.P. had a period of twenty (20) to thirty (30) seconds where she was not breathing and they initiated CPR.[6] N.T. 392. Upon initial examination, Dr. Peoples testified that, E.P. presented with respiratory distress, a frontal hematoma over the front of the scalp, and swelling, redness, and enlargement of the right leg. N.T. 395-396. X-rays showed multiple rib fractures on both the left and right sides, a mid-shaft femur fracture, and radius and ulna fractures on both arms. N.T. 398-399. Dr. Peoples testified that there was some varying ages to the radius and ulna fractures. N.T. 400.

---

on September 24, 2012. N.T. 611-612. Although E.P. was discharged home, E.P. required a pulse oximeter, which kept track of her oxygen levels, and an A&B monitor, which kept track of her heart rate and breaths. N.T. 613. If E.P. quit breathing or breathed too fast for a certain amount of time, or, if her heartbeat was too low or too high, the A&B monitor would go off. N.T. 613.

[2] The Trial in this matter occurred from December 1-5, 2014.

[3] Ms. Yoder testified that a normal, healthy infant would have between 95-100 oxygen saturation levels. N.T. 346.

[4] Dr. Peoples testified as an expert in emergency medicine. N.T. 390.

[5] Dr. Peoples testified that he spoke to Defendant and Peterman at the same time for maybe five (5) to ten (10) minutes. N.T. 410-411, 412.

[6] Dr. Peoples testified that Defendant and Peterman only told him of one incident in which CPR was performed on E.P. by the parents. N.T. 395.

Based upon E.P.'s significant difficulty breathing and the concern for injury and trauma, Dr. Peoples decided to intubate E.P., transfer her care to CHP, which provides a higher level of care for more severe patients, and Children and Youth Services were consulted regarding the concern for non-accidental trauma. N.T. 397-398, 401. Dr. Peoples explained that the femur fracture and the rib fractures are fairly uncommon fractures for a three-month old child, and that, because children's bones are fairly compliant and tend to bend, the rib fractures are uncommon even if CPR is performed. N.T. 401, 403. Additionally, Dr. Peoples testified that it is rare to see multiple rib fractures on both sides or mid-shaft femur fractures that are separated, which is what he saw with E.P. N.T. 403. Dr. Peoples described E.P.'s condition as critical and he opined that a single impact would not account for the injuries that he observed in E.P. N.T. 408-409.

E.P. was intubated and flown by helicopter to CHP. N.T. 398. Dr. Rachel Berger, a pediatrician and the Division Chief for the Division of Child Advocacy at CHP, who has dealt with thousands of child abuse cases in her career, testified as an expert in pediatrics and child abuse. N.T. 190-191, 196, 297. Dr. Berger became involved in E.P.'s case when one of the emergency room physicians, who examined E.P. and who was concerned about child abuse, called Dr. Berger, who was on-call for the Child Protection Team, to consult regarding the concerns. N.T. 197, 200. After the consult, Dr. Berger looked at the electronic medical records, reviewed the x-rays with the radiologist, and spoke to Defendant and Peterman in a conference room at the hospital. N.T. 200.

During the consultation with both Defendant and Peterman present, Dr. Berger asked the parents to tell her the last time E.P. was her usual self and there was nothing wrong with E.P. N.T. 203. Defendant told Dr. Berger that E.P. was well until October 18th. N.T. 203. Defendant reported that she was home with E.P. alone when the A&B monitor[7] went off. N.T. 203. Defendant stated that she left the kitchen, went in the other part of the trailer, which was only a few feet away, and stimulated E.P. by rubbing her chest and pinching her toe, but E.P. did not respond. N.T. 204. Defendant then gave E.P. CPR and, after two (2) or three (3) breaths, E.P. spit up some formula, began breathing, and, because E.P. seemed fine, Defendant took no further action. N.T. 204-205. Defendant reported that Peterman came home from work a few hours later and, because Defendant and Peterman discussed that E.P. was okay, neither felt medical treatment was necessary. N.T. 205.

---

[7] Dr Berger explained that an A&B monitor is an apnea and bradycardia monitor, that alarms if the heart stops or if someone stops breathing for a certain amount of time, so that the parents will know that something is wrong and can stimulate the baby. N.T. 203-204. In that E.P. was premature, her respiratory system wasn't mature and thus, E.P. was sent home with the monitor. N.T. 203.

Defendant advised Dr. Berger that E.P. was fine on October 19th, but, in the late afternoon on October 20th, E.P.'s monitor went off right after Peterman fed E.P. N.T. 205. Both Defendant and Peterman walked over to E.P. and when they saw that her lips were blue, her eyes were closed, and E.P. was not responsive, Peterman pinched E.P.'s toe and gave her CPR. N.T. 205-206. Peterman said that E.P. jerked, began to cry, and then seemed to be fine. N.T. 206. Neither parent did anything further until Defendant, while putting E.P.'s sleeper on, noticed E.P.'s swollen leg. N.T. 206. Defendant said the swollen leg wasn't bothering E.P., but the parents called the pediatrician who told them to go to the emergency room, which they did. N.T. 206.

Although neither Defendant nor Peterman initially brought up the issue of the bassinet falling, when Dr. Berger asked them about any other trauma or the specific injuries, Peterman brought up the bassinet issue. N.T. 206. Peterman reported that on October 17th, which was the day before the first event that Defendant reported, Peterman heard E.P. whimpering around 3:30 in the morning. N.T. 206. Peterman said that he immediately woke up and noticed that the bassinet[8] had fallen from itself. N.T. 206-207. Peterman stated that the screws broke and the bassinet fell onto the oxygen tank that was underneath the bassinet carrier and on top of the cloth shelf. N.T. 207. Peterman explained that E.P. did not fall out of the bassinet carrier, but that the bassinet carrier had fallen and kind of turned. N.T. 207. They had the actual bassinet with them and Dr. Berger testified that the "fall distance" would have been about eight (8) inches.[9] N.T. 207, 510. Peterman reported that E.P. was awake and didn't seem hurt so they took the bassinet carrier out and put it on the floor. N.T. 207. Neither parent sought medical attention for E.P. after that incident. N.T. 207.

Dr. Berger physically examined E.P. in the pediatric intensive care unit on October 22, 2012. N.T. 213, 222. Upon examination, E.P. was sedated, intubated on 100 percent oxygen,[10] on cardiac support,[11] she required a blood transfusion, and was on about as much support as someone can possibly be on without being on ECMO. N.T. 226, 271. Dr. Berger testified that, without the pressor support or the

---

[8] The bassinet was admitted into evidence without objection. N.T. p. 498. The bassinet consists of two separate apparatus, the bassinet carrier, within which the child would be placed, and the metal frame. N.T. p. 499. When extended, the metal frame looks like a V-shape, but when not extended, it folds up similar to an accordion. N.T. 502. When extended to the proper level, there are two plastic clips that clip onto the metal frame, one on each side, to secure the bassinet carrier to the frame. N.T. 502. There is also a cloth-type shelf underneath the bassinet on the frame which is where E.P.'s oxygen tank was located. N.T. 501.

[9] Tpr. Adamski testified that the "fall distance" was between eight (8) to ten (10) inches. N.T. 510.

[10] Dr. Berger testified that, normally, the air is 21 percent oxygen and the most that can be given to someone is 100 percent oxygen, which is what E.P. was on. N.T. 226. Dr. Berger further testified that they don't normally like to give 100 percent oxygen because it is toxic, particularly for infants, but E.P. needed that level of oxygen because E.P. wasn't breathing well at all. N.T. 226.

[11] Dr. Berger testified that E.P.'s heart wasn't pumping properly so E.P. was on pressors (epinephrine or norepinephrine) almost constantly to keep the heart pumping in order to support it. N.T. 226.

external oxygen, E.P. would have stopped breathing and died. N.T. 226. E.P. was so sick and her illness so severe that Dr. Berger was unable to do some of the things that she would normally do to examine an infant, such as looking in the mouth and turning the infant over to check the back and skin. N.T. 213. In addition to the necessary support, E.P. presented with multiple fractures at different stages of healing, including more than twenty (20) rib fractures, a metaphyseal femur fracture[12], an acute transverse femur fracture in the right leg, a very large, fairly acute, fracture of the parietal bone in the skull, the right arm had an acute[13] radius fracture, and the left arm had both subacute[14] radius and ulna fractures. N.T. 225, 227, 231, 248, 272, 399. E.P. also had perisplenic and retroperitoneal hematoma, the blood in the back, and possible splenic laceration, four small subdural hemorrhage and extradural hematoma, a single retina hemorrhage in her eye, and five contusions or bruising at the base of the lungs. 240, 246, 266-267, 270, 272, 273.

Throughout the family, medical, and social history that both parents provided to Dr. Berger, neither parent provided any significant history which would account for or provide an explanation for E.P.'s injuries. N.T. 203-213. Dr. Berger testified that the hospital tested E.P. for oxygenesis imperfecta, which is a rare disease that causes children's bones to fracture more easily, but E.P. tested negative for that genetic disease. N.T. 229-230. Additionally, the hospital conducted multiple lab tests which could indicate another reason for E.P.'s injuries, but all of the lab reports that Dr. Berger reviewed did not provide an explanation for the trauma that E.P. sustained. N.T. 230. Dr. Berger explained that, based on her evaluation, E.P. looked like a child that had been injured but not a child that had an underlying medical problem. N.T. 230-231.

Dr. Berger explained that the more than twenty (20) rib fractures[15] were healing in at least three different stages. N.T. 267-268. Dr. Berger testified that, the metaphyseal femur fracture has great significance because there is no accidental way to cause that type of injury. N.T. 252. Other than a breeched baby where the doctor yanks the baby out, the only other known mechanism that can cause that type of injury is child abuse. N.T. 252. Dr. Berger also explained that the metaphyseal femur fracture would have had to occur before the acute transverse femur fracture, but not at the same time. N.T. 256-258. Lastly, Dr. Berger explained that a transverse fracture is incredibly painful and one of the most painful fractures and, even changing a diaper on a baby with that kind of fracture, would be incredibly

[12] Dr. Berger explained that this fracture is essentially the growth plate on the femur being ripped off. N.T. 251-252.
[13] "Acute" means that the injury is new and you don't see healing. N.T. 248.
[14] "Subacute" means that there is some evidence of healing which means that it is probably more than three (3) days old, but probably less than seven (7) days old. N.T. 249.
[15] Some of the rib fractures were lateral, anterior, and some were posterior. N.T. 262.

uncomfortable. N.T. 258. Regarding the posterior rib fractures, Dr. Berger explained that those types of rib fractures are almost only from a squeezing and twisting, which are almost pathologic of abuse. N.T. 276-277. Additionally, Dr. Berger explained that you almost never get rib fractures from CPR, even in children and babies, regardless of whether the CPR is being performed by a professional or lay person. N.T. 277.

When questioned by Dr. Berger regarding any other possible caretakers for E.P., both parents reiterated that they were the only caretakers for E.P. N.T. 212. Ultimately, based upon all of the information that Dr. Berger reviewed, her examination of E.P., the history that she obtained, and all of the radiographic images that she reviewed, including the follow-up information, Dr. Berger opined that E.P.'s constellation of injuries were the result of child physical abuse which occurred on more than one occassion, that the injuries were life threatening, that E.P. did not have any underlying medical condition which would cause the injuries, that, although E.P. was premature, E.P.'s bones may be slightly weaker than a full-term infant, but that would not account for the injuries and would require significant force even in a premature baby. N.T. 273.

Dr. Berger also opined that the history of the fall from the bassinet could have accounted for one of the injuries, but that it did not account for all of the injuries, and that, E.P. was in significant pain at the time the fractures occurred. N.T. 273. Dr. Berger testified that it is not possible for an adult who is caring for her when both the bones in E.P.'s forearms were fractured to not know something was wrong and that it's not possible that E.P. was not in pain when the femur was fractured because it would be extremely painful when it occurred and afterwards. N.T. 273. Dr. Berger stated that the lack of seeking medical attention for E.P.'s injuries, as well as for the event in which Defendant gave chest compressions and rescue breaths, constitutes medical neglect. N.T. 273. Dr. Berger also explained that, after E.P. was in foster care, Dr. Berger did see her at the hospital and all of the fractures had healed and E.P. had no additional fractures at that time. N.T. 281. Dr. Berger concluded that there would be no other explanation of E.P.'s injuries other than her diagnosis of child abuse. N.T. 282.

The WCCB became involved in this case when the on-call caseworker Amie Skolak (hereinafter "Ms. Skolak") received a referral from ChildLine, the child abuse registry in Pennsylvania, regarding E.P. at approximately 7:08 p.m. on October 20, 2012. N.T. 131-132, 142. At approximately 10:14 p.m., after speaking to a social worker at CHP by telephone, Ms. Skolak testified that she spoke to Peterman by telephone. N.T. 133. Peterman provided identifying information and, after Ms. Skolak made Peterman aware of the injuries reported in the ChildLine referral, Peterman reported that E.P.'s injuries were likely

from a bassinet fall. N.T. 135, 147-149. Peterman reported to Ms. Skolak that E.P. was in an accordion style bassinet which utilizes two pins to hold the unit together. N.T. 135. Peterman stated that when one of the pins broke, the bassinet, with E.P. in it, fell onto a canopy below the bassinet which housed E.P.'s oxygen tank. N.T. 135. When that occurred, E.P. was fussing, but had no visible marks, no swelling, and E.P. continued to eat well. N.T. 135.

Otherwise, Peterman reported an incident which occurred approximately three days prior where, after feeding E.P., E.P. started to burp up, then she quit breathing, and Defendant performed CPR. N.T. 135. Ms. Skolak advised Peterman that she was required to see E.P. at the hospital and to meet with him and Defendant within twenty-four (24) hours of the report. N.T. 136. Although Peterman gave Ms. Skolak a time that he and Defendant would be at CHP the following day, when Ms. Skolak arrived at CHP on October 21, 2014, within the time frame that Peterman said they would be at the hospital, Defendant and Peterman were not there. N.T. 136-139. Ms. Skolak was not able to meet with Defendant and Peterman in-person and, thereafter, the case was transferred to WCCB assessment caseworker Brandy Trout (hereinafter "Ms. Trout"). N.T. 138-140.

Ms. Trout testified that she was assigned the case to conduct the investigation regarding the ChildLine referral on October 22, 2012 and that she made arrangements to go to E.P.'s home. N.T. 152. Ms. Trout, along with a couple state troopers, met with Defendant and Peterman in their home in New Alexandria, Pennsylvania on October 23, 2012.[16] N.T. 153-154. Ms. Trout testified that the home, which is a trailer, is located within walking distance to multiple residences, one of which is Peterman's father's residence. N.T. 153. While Ms. Trout was in the home, Peterman reported to her that on October 17, 2012, while Defendant was sleeping in the bedroom, Peterman was sleeping in the living room with E.P. in the bassinet in the same room. N.T. 156. Around 3:00 or 4:00 a.m., Peterman awoke and E.P. was making a whimpering noise, but not crying. N.T. 156. Peterman reported that he checked E.P.'s apnea monitor, but it was not going off. N.T. 156. After seeing that the bassinet was resting on its right side, with the left end still connected to the frame and the other side down, and that the two pins from the frame were bent, the position of which Peterman demonstrated for Ms. Trout, Peterman stated that he picked up E.P., who was fussing and whimpering, from the bassinet. N.T. 156-157. Peterman told Ms. Trout that E.P. calmed instantly as Peterman rubbed E.P.'s back and that E.P. looked fine with no marks. N.T. 157. Peterman reported that he then placed E.P. back in the bassinet carrier and moved it to the couch because that was where Peterman was sleeping for the night. N.T. 157.

---

[16] Both Defendant and Peterman voluntarily spoke with Ms. Trout and the troopers. N.T. 166.

While Peterman was in the living room assembling the bassinet and equipment for the troopers as they were photographing things, Ms. Trout and Tpr. Adamski spoke with Defendant in the parents' bedroom. N.T. 157-158. Defendant reported to Ms. Trout that Defendant remembered waking up in bed in their bedroom on October 17, 2012, around 11:00 p.m., with Peterman next to her and E.P. in the bassinet on the wooden chair in front of the dresser. N.T. 158-159, 166. Defendant stated that after she put a bottle in the microwave, Defendant changed E.P.'s diaper and did not notice anything wrong with E.P. on October 17, 2012. N.T. 159.

Defendant told Ms. Trout that, on October 18, 2012, around 7:30 p.m., when Defendant was in the kitchen, E.P.'s apnea monitor went off. N.T. 159, 167, 178. Defendant ran back, flipped on the lights and saw that E.P.'s lips were blue. N.T. 167. Defendant put her hand on E.P.'s chest and after Defendant's attempts to rock E.P. awake showed no results, Defendant squeezed E.P.'s toes as Defendant had been taught to do at the hospital. N.T. 167. After E.P. still did not respond and with her head hung back and lifeless, Defendant took E.P.'s clothes and monitor off and performed CPR on E.P. N.T. 159, 167. E.P. then burped up some formula and, to Defendant, E.P. seemed okay. N.T. 167. Defendant told Ms. Trout that Peterman was not home on that day, and that, because Defendant did not have a phone, Defendant did not call Peterman. N.T. 159,169.

Defendant reported that E.P. was fine on October 19th, but on October 20, 2012, around 2:00 or 3:00 p.m., after just being fed and while in the bassinet, E.P.'s alarm went off. N.T. 159. Defendant stated that E.P. was unresponsive so Peterman put E.P. on the bed and performed CPR. N.T. 159. When Ms. Trout asked Defendant when Defendant realized that something was wrong with E.P., Defendant told Ms. Trout that, while she was dressing E.P., Defendant noticed that E.P.'s right leg was swollen, so after calling the pediatrician, they were told to take E.P. to the hospital. N.T. 159.

When Ms. Trout questioned Defendant and Peterman regarding E.P. not being taken to the hospital on the 18th after Defendant had performed CPR on E.P., Defendant and Peterman told Ms. Trout that, together, they made the decision to not seek medical treatment for or to take E.P. to the hospital because E.P. had no noticeable injuries. N.T. 160-161. When questioned regarding any additional caregivers other than Defendant and Peterman, for E.P., Defendant told Ms. Trout that although a paternal aunt was around E.P. while the parents did laundry with the paternal aunt, paternal aunt was never alone with E.P. N.T. 160.

Tpr. Adamski was the primary State Trooper investigating this case. N.T. 469. After receiving a call from WCCB caseworker Amie Skolak, Tpr. Adamski traveled to CHP to begin the investigation. N.T.

470. Tpr. Adamski spoke to all of the treating physicians, the WCCB caseworkers involved in the case, and Defendant and Peterman. N.T. 470-477. The first time Peterman spoke to Tpr. Adamski was on October 21, 2012. N.T. 477. Peterman reported that he worked at his father's garage at the trailer park where Peterman and Defendant's trailer was located. N.T. 476. During that interview, Peterman told Tpr. Adamski that, at the time of the October 17th incident, Peterman was sleeping on a couch in the living room with E.P. in her bassinet, while Defendant slept in their bedroom. N.T. 477-478. When Peterman woke up because E.P. was fussing and he saw that the bassinet had fallen, Peterman woke Defendant up and they both checked on her before they went back to bed. N.T. 478-479. Peterman reported that the following day, on October 18th, when he arrived home around 10:00 p.m., Defendant was upset and reported to Peterman that the monitor went off and E.P. was not breathing. N.T. 480. Peterman reported that Defendant told him that Defendant gave E.P. C.P.R. and E.P. became responsive again. N.T. 480. Peterman stated that the following day, on October 19th, E.P. was fine. N.T. 480. Peterman told Tpr. Adamski that, on October 20th, E.P.'s alarm went off around 1:30 p.m. to 2:00 p.m. and, during that incident, Peterman performed C.P.R. on E.P. before they called the pediatrician and ultimately transported E.P. to Westmoreland Hospital. N.T. 481-482.

Tpr. Adamski testified that Peterman said that only Defendant and Peterman took care of E.P. N.T. 486. After that, Tpr. Adamski interviewed Defendant. N.T. 488. Defendant stated that she was a stay-at-home mom. N.T. 488. Regarding the October 17th incident, Defendant reported that she was sleeping in the bedroom and Peterman and E.P. were sleeping in the living room. N.T. 489. Defendant stated that Peterman told her, in the morning, that the bassinet broke and fell over, that Peterman checked on E.P., and E.P. seemed fine. N.T. 489. Defendant's report regarding October 18th, 19th, and 20th was essentially consistent with previous reports. N.T. 489-491. Defendant told Tpr. Adamski that she did not mishandle E.P., even accidentally. N.T. 491. Defendant also reported that she and Peterman were the only caregivers for E.P. N.T. 492. After Defendant and Peterman provided conflicting stories regarding October 17th, Tpr. Adamski spoke to Peterman again and made him aware of the conflict; however, Peterman did not respond or correct Tpr. Adamski. N.T. 492-493.

Tpr. Adamski stated that Defendant and Peterman's trailer measured approximately 52 by 14 feet wide, and that, the trailer was thinly insulated. N.T. 516. When Tpr. Adamski was present during the interview with Defendant and Peterman at the residence and the other state troopers were there, Tpr. Adamski did not have a problem hearing people in other parts of the trailer. N.T. 516.

PSP Corporal David Leonard (hereinafter "Cpl. Leonard") testified that he assisted Tpr. Adamski with suspect interviews related to this case. N.T. 416. Cpl. Leonard stated that he interviewed Defendant on October 30, 2012 at the PSP Kiski barracks. N.T. 417. When he questioned Defendant regarding whether she had done anything even accidentally to contribute to E.P.'s injuries, Defendant stated that she did not. N.T. 418. Cpl. Leonard testified that there were numerous inconsistencies in Defendant's rendition of the events which could have caused E.P.'s injuries. N.T. 417-418. Importantly, when Cpl. Leonard asked Defendant if there were any other incidents which could have caused E.P.'s injuries, Defendant reported that there was a second bassinet collapse sometime between October 1st and 17th, but before October 17th. N.T. 423. Defendant reported that the incident occurred while Defendant was in the shower and Peterman was with E.P. N.T. 423. That was significant because it was the first time anyone reported a second bassinet collapse.

Cpl. Leonard testified that he also assisted Tpr. Adamski with interviewing Peterman on November 5, 2012 at PSP Kiski barracks. N.T. 423. When he asked Peterman regarding whether he had done anything even accidentally to contribute to E.P.'s injuries, Peterman stated that he did not. N.T. 424. When Peterman described the bassinet incident on the 17th, Peterman told Cpl. Leonard that, after the bassinet fell, E.P. was facing downward, lying on the oxygen tank. N.T. 425. Additionally, Peterman stated that he took E.P. into the parents' bedroom where Defendant was sleeping, placed E.P. in the bassinet, and they went to sleep. N.T. 425. Cpl. Leonard noted that Peterman's description was inconsistent with prior statements that he had provided. Peterman also, for the first time, told Cpl. Leonard about a second bassinet collapse in which he claimed he caught the bassinet before it completely fell and E.P. did not fall from it, and about the parents having a black lab who gets excited when E.P.'s alarm goes off. N.T. 426-427.

Dr. Dwayne Shuhart, a physician at Children's Community Pediatrics in Blairsville, Pennsylvania, testified as an expert in pediatrics. N.T. 317-320. Dr. Shuhart examined E.P. on several occasions for check-ups at the Blairsville office. N.T. 322. Defendant and Peterman took E.P. to her first visit with Dr. Shuhart on September 25, 2012. N.T. 322-323. At that visit, Dr. Shuhart conducted a head-to-toe assessment of E.P., which included feeling the belly, listening to the lungs, manipulation of the hips by bending the legs out and back a couple times and touching the head to check the fontanel and anterior fontanel. N.T. 324-325. Other than being a normal, newborn pre-term baby who had some bradycardia, Dr. Shuhart testified that E.P. was within normal limits and the assessment was unremarkable. N.T. 326.

Defendant and Peterman took E.P. to her second visit, a scheduled follow-up, with Dr. Shuhart on October 9, 2012. N.T. 326-327. Dr. Shuhart testified that he conducted the same head-to-toe assessment of E.P. which required manipulation of E.P.'s body in the same manner as the first visit. N.T. 328. Again, the assessment resulted in E.P. being within normal limits. N.T. 328. Dr. Shuhart testified that, based upon what occurs during the examinations, and how E.P. appeared during the exams on September 25th and October 9th, Dr. Shuhart opined that it was not likely that E.P. had over twenty (20) rib fractures, a flail chest, a skull fracture, or a femur fracture when he examined her on either date. N.T. 331-332. Dr. Shuhart explained that the fractured ribs would be quite painful and, based upon the movements conducted during the examination, he would expect the baby to be crying, fussing, and uncomfortable. N.T. 331. Also, based upon the manipulation that is done during the head and leg examination, the doctor opined that he would have picked up on any fractures. N.T. 332. Dr. Shuhart did not see, or note in the report, any swelling or bruising at all during either visit. N.T. 333.

On Saturday, October 20, 2012, Peterman called the office at 2:44 p.m., but because the call occurred on the weekend, the call was handled by an answering service. N.T. 329. Dr. Shuhart testified that the information received from the call was something about the leg and that the apnea monitor went off twice, once two to three days ago and then again a few minutes ago for low heart rate and not breathing. N.T. 329-330. Additionally, it was reported that, after checking, mom did CPR both times, E.P. vomited a large amount and then started to breathe, having slight stynosis of lips. N.T. 330. Dr. Shuhart stated that the triage person recommended that E.P. go immediately to the emergency room and, although an ambulance was offered, the family said they had an ETA of fifteen (15) to twenty (20) minutes to the hospital so they would drive the baby there. N.T. 330.

Thomas Stivason, E.P.'s foster father, testified regarding E.P.'s continuing problems. N.T. 456. Mr. Stivason and his wife, Robin, have had custody of E.P. since she was discharged from CHP on October 31, 2012. N.T. 456. Although E.P. has had no further fractures since being in their custody, Mr. Stivason testified that E.P. is doing good, but continues to have trouble with walking/running and that she falls often. N.T. 457. Although E.P. is two years old, she can't really run and she catches colds quite often, which results in the colds going straight to bronchitis. N.T. 458.

Meagan White, Defendant's cousin, testified that Defendant's reputation in the community is for being an honest, peaceful, non-violent, and very well liked person. N.T. 587-588.

Sue London, who has known Defendant for Defendant's entire life, testified that Defendant is an honest, peaceful, non-violent person, and very well respected in the community. N.T. 589-591.

Defendant testified on her own behalf. N.T. 607. Defendant, who is twenty-three (23) years old, testified that she first met Peterman in October of 2011, that they started residing together sometime thereafter, and that, she became pregnant with E.P. in December of 2011. Defendant testified regarding E.P.'s developmental history, about what the parents had learned while E.P. was at The Children's Home, and about how Defendant felt E.P. was normal baby. N.T. 610-612. Defendant stated that she would never intentionally hurt E.P. N.T. 615. Defendant then testified regarding the incidents on October 17th through October 20th and, when asked whether E.P. showed any signs of injuries or bruising, Defendant stated that E.P. did not. N.T. 615-617. Defendant stated that, after the incident on October 18th, she did not call 911 because she did not have a cell phone or landline telephone. N.T. 617-618.

Defendant recounted what occurred on October 20th and stated that, once Defendant and Peterman were with E.P. at Westmoreland Hospital, Defendant stayed out of hospital staff's way and that she was in shock. N.T. 622-623. Throughout her testimony, Defendant stated that she never saw any bruising or injuries on E.P. N.T. 626. Defendant admitted that she recalled telling Cpl. Leonard about a second bassinet collapse that occurred prior to the one Defendant and Peterman reported, but Defendant could not recall whether she told Dr. Berger about the second bassinet collapse or if there was a reason that Defendant didn't tell Tpr. Adamski about it. N.T. 637-638.

Defendant testified that she would never intentionally, knowingly, or recklessly injure E.P, nor did she conspire with Peterman or have some agreement or plan with Peterman to injure E.P. N.T. 640. Defendant denied that she aided or facilitated Peterman in injuring E.P. and Defendant denied that she knowingly endangered E.P. N.T. 640. Lastly, Defendant stated that she never committed any crimes on E.P. N.T. 641.

On cross-examination, Defendant admitted that, while at The Children's Home, Defendant and Peterman received training related to providing care to meet E.P.'s medical needs. N.T. 649-654. Defendant signed a document which indicated that Defendant should call the doctor if there's respiratory distress and that Defendant should call a doctor when the baby is acting very sick. N.T. 648. Defendant further admitted that, when E.P. was not breathing on October 18th, E.P. was very sick and not responding. N.T. 649. Defendant testified that, when Defendant was awake, she would be able to hear E.P. cry from any room in the family's trailer. N.T. 654. Defendant admitted that, after the October 17th bassinet incident, Defendant handled E.P. numerous times, and that said handling would require Defendant to manipulate E.P.'s body to change her diaper and sleepers and to feed and burp E.P. N.T. 662-665. Defendant testified that she knew the incident on October 18th was very serious, but although there were

around eleven other trailers in their trailer park and Defendant was near a busy road, Defendant did not carry E.P. anywhere to seek help for E.P. N.T. 666-672. Instead, Defendant waited an hour and a half until Peterman came home and, even then, the two consulted and decided not to seek medical assistance. N.T. 667. Defendant stated that although she handled E.P. numerous times and in multiple ways between October 18th and October 20th, Defendant did not think E.P. was hurt in any way. N.T. 672-673.

When questioned regarding the forty-four (44) minutes between when E.P.'s monitor went off on October 20th and when Peterman called the pediatrician's office, Defendant stated that she could not recall what caused the delay other than Peterman performing CPR. N.T. 676. When questioned why it took one (1) hour and ten (10) minutes from the time Peterman spoke to the pediatrician's office to Defendant and Peterman arriving at Westmoreland Hospital, Defendant stated that they had to get the diaper bag together, the bottles made, extra clothes, and putting E.P. in her car seat. N.T. 678. When questioned regarding E.P.'s caregivers, Defendant maintained that Defendant and Peterman were the only caregivers and that they provided said care together. N.T. 681.

## STIPLUATIONS

The parties stipulated that Dr. Gretchen Krimmel, a physician employed by West Penn Hospital, would testify that she treated E.P. when, after E.P.'s birth at Westmoreland Hospital and due to issues related to E.P.'s prematurity, E.P. was transferred to West Penn Hospital on July 20, 2012. N.T. 441-442. During E.P.'s hospitalization and ultrasound, E.P.'s head was normal with no bleeding and fractures, E.P. also had multiple normal chest x-rays and no evidence of fractures or bone problems were seen while E.P. was treated at West Penn, and E.P. physically developed well during her stay. N.T. 442. On September 12, 2012, the date of E.P.'s discharge from West Penn and transfer to The Children's Home, Dr. Krimmel conducted a full body head-to-toe examination of E.P. and E.P. was normal and had no injuries. N.T. 442-443. E.P. was discharged to The Children's Home with supplemental oxygen administered by nasal cannula. N.T. 443. Dr. Krimmel's discharge planning noted that E.P. would need to be discharged home on oxygen by nasal cannula, an A&B monitor, and that E.P.'s family required a monitor, a supplemental oxygen monitor, and CPR training prior to E.P. going home. N.T. 443.

The parties also stipulated that Erin Colvin, the Clinical Director of The Children's Home, would testify that E.P. was a patient at The Children's Home from September 12, 2012 through September 24, 2012. N.T. 444. E.P. was transferred there for further treatment of her prematurity and to prepare her and her parents for eventual discharge home, and that, head-to-toe assessments of E.P. were all normal. N.T.

444. The medical records indicate that, prior to E.P.'s discharge home on September 24, 2012, E.P. was given a full head-to-toe assessment, and that, her exam was normal with no fractures and she was developing well. N.T. 447.

## DISCUSSION

### I. Motion for Judgment of Acquittal at Count 2: Conspiracy

Defendant challenges the sufficiency of the evidence to prove Defendant committed the crime of Criminal Conspiracy to Commit Aggravated Assault. Defendant does not challenge the sufficiency of the evidence to prove that Defendant committed the crime of Criminal Conspiracy to Commit Endangering the Welfare of Children. Defendant argues that the verdict of Not Guilty as to the Aggravated Assault charge and Guilty as to the Conspiracy to commit Aggravated Assault are inconsistent verdicts and, therefore, the Conspiracy charge should not stand. In arguing that there was no evidence for the jury to convict Defendant of Conspiracy to commit Aggravated Assault, Defendant argues that the jury was "overwhelmed by the horrific injuries sustained by the child victim." (Def's Br. p. 5.)

In pertinent part, the Commonwealth alleged that Defendant, with the intent of promoting or facilitating the crime of Aggravated Assault against E.P., conspired and agreed with Peterman, that they or one or more of them would engage in conduct constituting such crime, and in furtherance thereof, one or more of them did commit the overt act of inflicting trauma upon E.P. In Pennsylvania, a person is guilty of conspiracy with another person to commit a crime if with the intent of promoting or facilitating its commission he or she agrees with such other person or that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime. 18 Pa.C.S.A. § 903(a)(1).

As charged in this case, a person is guilty of Aggravated Assault if he or she attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life. 18 Pa.C.S.A. 2702(a)(1). Serious bodily injury is bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ. 18 Pa.C.S.A. § 2602. A person acts intentionally with respect to serious bodily injury when it is his or her conscious object or purpose to cause such injury. 18 Pa.C.S.A. § 302(b)(1). A person acts

knowingly with respect to serious bodily injury when he or she is aware that it is practically certain that his or her conduct will cause such a result. 18 Pa.C.S.A. § 302(b)(2). A person acts recklessly with respect to serious bodily injury when he or she acts with malice. Malice exists where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. Where malice is based on reckless disregard of consequences, it is not sufficient to show mere recklessness, it must be shown that the defendant consciously disregarded unjustified and extremely high risk that his and/or her actions might cause death or serious bodily injury. 18 Pa.C.S.A. § 302(b)(3); Pa. SSJI (Crim) § 15.2702B.

Defendant argues that there was no evidence, direct or circumstantial, that Defendant conspired with Peterman to commit the crime of Aggravated Assault on E.P., that there was no evidence to prove an agreement to commit Aggravated Assault, and that there was no evidence to prove an overt act committed by either parent in furtherance of the conspiracy. (Def.'s Br. p. 4 ¶12-14). In Commonwealth v. Johnson, the Pennsylvania Superior Court explained:

> To sustain a conviction for criminal conspiracy, the Commonwealth must establish that the defendant (1) entered an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and, (3) an overt act was done in furtherance of the conspiracy.
>
> The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Commonwealth v. Keefer, 487 A.2d 915, 918 (Pa. Super. 1985). Therefore, a conviction for conspiracy requires proof of the existence of a shared criminal intent. Commonwealth v. Sattazahn, 631 A.2d 597, 602 (Pa. Super. 1993) appeal denied, 652 A.2d 293 (Pa. 1994).
>
> An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Commonwealth v. Kennedy, 499 Pa. 389, 395, 453 A.2d 927, 929–930 (Pa. 1982). Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. Commonwealth v. Woodward, 614 A.2d 239, 243 (Pa. Super. 1992).
>
> The conduct of the parties and the circumstances surrounding their conduct may create 'a web of evidence' linking the accused to the alleged conspiracy beyond a reasonable doubt. Commonwealth v. McKeever, 689 A.2d 272, 274 (Pa. Super. 1997). Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators taken in furtherance of the

conspiracy. Commonwealth v. Soto, 693 A.2d 226, 229–230 (Pa. Super. 1997), appeal denied, 705 A.2d 1308 (Pa. 1997).

Commonwealth v. Johnson, 719 A.2d 778, 784–85 (Pa. Super. 1998) (*en banc*).

Pennsylvania law does not require consistent verdicts. Com. v. Tha, 64 A.3d 704, 711 (2013).

> Inconsistent verdicts, while often perplexing, are not considered mistakes and do not constitute a basis for reversal. Rather, the rationale for allowing inconsistent verdicts is that it is the jury's sole prerogative to decide on which counts to convict in order to provide a defendant with sufficient punishment.

Id. Further, in Com. v. Moore, 103 A.3d 1240 (2014), the Pennsylvania Supreme Court stated that jury acquittals are not to be interpreted as specific factual findings regarding the evidence. Id. at 1246. There are multiple reasons why a jury may have acquitted a defendant on any particular charge other than a finding of innocence. Courts may not upset verdicts by speculation or inquiry into the reasons for the acquittal. Id. *citing* United States v. Dunn, 284 U.S. 390, 394, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *see also* Com. v. Carter, 282 A.2d 375, 376 (1971).

In Commonwealth v. Brown, the Pennsylvania Superior Court stated:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

23 A.3d 544, 559-560 (Pa. Super. 2011) (*en banc*) *citing* Commonwealth v. Hutchinson, 947 A.2d 800, 805–06 (Pa. Super. 2008), appeal denied, 980 A.2d 606 (Pa. 2009).

Although Defendant argues to the contrary, this Court finds that there was sufficient evidence that Defendant entered into an agreement with Peterman to commit Aggravated Assault on E.P., and that, one or both of them, committed the overt act of inflicting forcible trauma upon E.P. Both Defendant and Peterman always maintained that they were E.P.'s only caretakers. Viewing the evidence in the light most favorable to the Commonwealth, E.P. was a healthy and fracture-free infant when she left

The Children's Home and was placed exclusively in Defendant and Peterman's care. There was no family medical history that would account for E.P.'s near-fatal injuries and, E.P. did not suffer from any genetic disease which would account for the severe injuries. Defendant testified that both parents received training at The Children's Home regarding E.P.'s medical needs, how to perform CPR should it be necessary, and on how to operate the medical apparatus that E.P. would necessitate upon discharge. Defendant admitted that she was aware that E.P. was having multiple "medical episodes," during which, neither parent was able to stimulate E.P. back to consciousness without performing CPR, from October 17th through October 20th. Defendant admitted that Defendant and Peterman each told the other about every medical episode that occurred, but together, they decided not to seek medical care for their infant daughter.

Additionally, although Defendant and Peterman consistently denied accidentally or intentionally injuring E.P., Dr. Berger testified that, based upon her experience in handling over a thousand child abuse cases, and upon her examination of all the records and her physical assessment of E.P., E.P.'s injuries were the result of child abuse that occurred on more than one occasion and that the injuries were extremely painful and life threatening. Dr. Berger explained that E.P.'s multiple rib fractures could not have been the result of the CPR that was performed on E.P. Dr. Berger also opined that the history of the fall from the bassinet could have accounted for one of the injuries, but that it did not account for all of the injuries, and that E.P. was in significant pain at the time the fractures occurred. As Dr. Berger explained, it would not have been possible for Defendant and Peterman to be unaware that E.P.'s forearms and femur were fractured or that E.P. was in a tremendous amount of pain.

The Commonwealth was not required to prove a spoken agreement between Defendant and Peterman for purposes of a conspiracy, but the Commonwealth did prove that the only caretakers for E.P. were Defendant and Peterman, that Defendant and Peterman were communicating on multiple occasions regarding whether to take E.P. to seek additional medical treatment, and that E.P. suffered near-fatal injuries of varying ages, that were, according to Dr. Berger, a result of child abuse. Further, in her closing argument, the Assistant District Attorney offered overt agreements between the defendants as well as the circumstantial evidence of the conspiracy. The evidence presented and all reasonable inferences arising from the evidence were sufficient to prove guilt beyond a reasonable doubt. Commonwealth v. Madison, 462 A.2d 228 (Pa. 1983). Clearly, from the jury's verdict, the jury believed that the Commonwealth met its burden and that Defendant conspired with Peterman to commit the Aggravated Assault, but that

Defendant did not commit the Aggravated Assault herself. Based upon the evidence presented, this Court finds no error in the jury's verdict or in the sufficiency of evidence upon which the jury's verdict is based.

Defendant also argues that this Court did not properly instruct the jury regarding Count 2: Criminal Conspiracy, in that, the Court did not instruct the jury that they could find Defendant guilty of Conspiracy to Commit Endangering the Welfare of Children but acquit Defendant on the more serious charge of Conspiracy to Commit Aggravated Assault. This Court is not persuaded by Defendant's argument. This Court did read the standard jury instruction regarding criminal conspiracy and, in addition, this Court explained the Jury Verdict Form. N.T. 836. This Court instructed the jury as follows:

> So, let me explain the verdict slips.[] Count 2, guilty or not guilty. And then you'll see under Count 2, which is the criminal conspiracy, that you need to make a finding as to guilty as to which crime, if any, was the object of the conspiracy. So, you'll see aggravated assault, conspiracy, guilty or not guilty. Endangering welfare of children, conspiracy, guilty or not guilty. So, you find guilty or not guilty as to conspiracy and then tell me which if any of the crimes were the object of the conspiracy.

N.T. 836-837. This Court finds that it did properly instruct the jury with respect to Count 2: Criminal Conspiracy. Additionally, a defendant fails to preserve a claim for appellate review that the trial court erred in it charge where the defendant did not declare that he lodged specific objections or exceptions to the instruction that was given. Commonwealth v. Baker, 963 A.2d 495 (Pa. Super. 2008). Here, defendant did not object to this Court's instruction prior to or, at the time it was read, although said instruction was offered to both parties prior to the instruction being read during the jury charge. In fact, Counsel for all parties involved agreed that the jury instructions and verdict slip were appropriate. N.T. 740-743. Therefore, this Court finds no merit to this issue.

## II. Motion to Modify Sentence

Defendant next alleges that this Court issued an illegal and excessive sentence when this Court sentenced Defendant, at Count 2, Conspiracy to Commit Aggravated Assault, to a state correctional institution for a period of not less than five (5) years nor more than ten (10) years. Defendant alleges that this Court based said sentence on the nature of the crime and completely ignored the mitigating factors Defendant was entitled to and the rehabilitative needs of Defendant. Defendant requests the court to modify the imposed sentence to a fair and appropriate sentenced based upon the sentencing guidelines. It is well-settled that:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will or arrived at a manifestly unreasonable decision.

Commonwealth v. Buterbaugh, 91 A.3d 1247, 1265 (Pa. Super. 2014) (internal citations omitted). In

Commonwealth v. Shugars, the Pennsylvania Superior Court explained:

> When imposing a sentence, the sentencing court must consider the factors set out in 42 [Pa.Cons.Stat.Ann] § 9721(b), that is, the protection of the public, gravity of offense in relation to impact on victim and community, and rehabilitative needs of the defendant. [Commonwealth v. Fullin, 892 A.2d 843, 847 (Pa. Super. 2006)]. Furthermore, "[a] trial court judge has wide discretion in sentencing and can, on the appropriate record and for the appropriate reasons, consider any legal factor in imposing a sentence in the aggravated range." Commonwealth v. Stewart, 867 A.2d 589, 593 (Pa. Super. 2005) (citation omitted). The sentencing court, however, must also consider the sentencing guidelines.

Com. v. Shugars, 895 A.2d 1270, 1275 (Pa. Super 2006); 42 Pa.C.S.A. § 9721.

At sentencing, this court was presented with, at Count 2, the charge of Criminal Conspiracy to Commit Aggravated Assault 18 Pa.C.S. §903(a)(1), 1st degree felony, with an offense gravity score of ten (10) and a minimum standard sentencing range of twenty-two (22) to thirty-six (36) months, given a prior record score of zero (0), a mitigated minimum sentence of ten (10) months, and an aggravated minimum sentence of forty-eight (48) months. See 204 Pa. Code § 303.16(a). According to statute, the maximum penalty for Count 2 was twenty (20) years' incarceration. 18 Pa.C.S.A. § 1103. Regarding imposition of a sentence for a felony:

> [T]he court shall make as a part of the record, and disclose in open court at the time of sentencing, a statement of the reason or reasons for the sentence imposed. Commonwealth v. Mouzon, 571 Pa. 419, 812 A.2d 617, 620–21 (2002); see 42 Pa.C.S. § 9721(b). The sentencing guidelines are not mandatory, and sentencing courts retain 'broad discretion in sentencing matters, and therefore, may sentence defendants outside the [g]uidelines.' Id. In every case where the court imposes a sentence [] outside the guidelines adopted by the Pennsylvania Commission on Sentencing [] the court shall provide a contemporaneous written statement of the reason or reasons for the deviation from the guidelines." 42 Pa.C.S. § 9721(b). However, "[t]his requirement is satisfied 'when the judge states his reasons for the sentence on the record and in the defendant's presence.' Commonwealth v. Widmer, 667 A.2d 215, 223 (Pa. Super. 1995), reversed on other grounds, 689 A.2d 211 (Pa. 1997). Consequently, all that a trial court must do to comply with the above procedural requirements is to state adequate reasons for the imposition of sentence on the record in open court. See Robinson, 931 A.2d at 26

[*quoting* Commonwealth v. Walls, 846 A.2d 152, 158 (Pa. Super. 2004), *reversed on other grounds*, 926 A.2d 957 (Pa. 2007)] ("If a court chooses to sentence a defendant outside of the sentencing guidelines, it should state on the record adequate reasons for the deviation.").

When imposing sentence, a court is required to consider 'the particular circumstances of the offense and the character of the defendant.' Commonwealth v. McClendon, 589 A.2d 706, 712–13 (Pa. Super. 1991) (*en banc*). In considering these factors, the court should refer to the defendant's prior criminal record, age, personal characteristics, and potential for rehabilitation.

Commonwealth v. Antidormi, 84 A.3d 736, 760-761 (Pa. Super. 2014), *appeal denied*, 95 A.3d 275 (Pa. 2014).

Defendant argues that, at Sentencing, this Court made a statement regarding being outraged as a mother at the actions of Defendant in protecting Peterman rather than her baby girl. Defendant places great emphasis on that one particular sentence contained within the entire sentencing proceeding, and alleges that said statement was the fundamental basis for this Court's imposition of sentence. Contrary to Defendant's assertion, this Court did not sentence Defendant based upon emotion and the serious nature of the crime alone. The above-referenced passing remark was not the sole consideration in imposing Defendant's sentence. This Court very carefully considered the information contained in the Pre-Sentence Investigation report that was prepared by Janice M. DeFloria of the Westmoreland County Probation Office's Presentence Investigation Unit.

Where pre-sentence reports exist, the court shall continue to presume that the sentencing judge was aware of relevant information regarding [the Defendant's] character and weighed those considerations along with mitigating statutory factors. A pre-sentence report constitutes the record and speaks for itself.

Commonwealth v. Devers, 546 A.2d 12, 18 (Pa. 1988). Contained within said Pre-Sentence Investigation were programs that Defendant participated in while incarcerated, Defendant's familial, employment, marital, educational, physical, drug and alcohol, mental health, and criminal histories. Contrary to the Defendant's assertion, this Court did take into account the factors that Defendant set forth in her Post-Sentence Motion for Modification of Sentence.

In addition, this Court considered the testimony of Robin Stivason, E.P.'s foster mother and who testified on E.P.'s behalf, Clement Peterman, Christopher Peterman's father, Sheila Peterman, Christopher Peterman's stepmother, Lisa Peterman, Christopher Peterman's sister, both Defendant and Christopher Peterman, and this Court considered the arguments that their respective attorney's made on their behalf.

N.T. March 19, 2015.[17] This Court did consider the severe injuries that E.P. sustained and the fact that Defendant made a conscious decision to not seek medical treatment for those injuries until E.P. was near death. S.T. 52. This Court considered the rehabilitative needs of Defendant and the Court's need to protect society. S.T. 53-54.

While the Court considered and specifically indicated that the Defendant had no prior record, the Court also considered and found compelling that the Defendant admitted that only she and Peterman were caretakers for E.P., that the facts established that E.P. suffered child abuse on multiple occasions and, as a result of E.P.'s injuries, E.P. almost died. This Court also considered that E.P. continues to have lingering physical impairment due to her injuries.

In considering the need to protect the public, this Court determined that the only possible sentence should be a lengthy one that would ensure that the Defendant would not harm or allow another person to harm another child. S.T. 53. While this Court's sentence is above the aggravated range, it is warranted under the facts and circumstances of this case, is not manifestly excessive, and is certainly not illegal. Further, this Court articulated, on the record, the reasons that the Defendant's sentence was outside of or in the aggravated range of the sentencing guidelines. S.T. 56-57. The sentencing court has broad discretion in sentencing a defendant. Commonwealth v. Fish, 752 A.2d 921, 923 (Pa. Super. 2000). The sentencing judge is accorded great deference as it is the sentencing judge that is in the best position to view the defendant's character, displays of remorse, defiance, or indifference, and the overall effect and nature of the crime. Id. A sentencing court will not have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. Commonwealth v. Moury, 992 A.2d 162 (Pa. Super. 2010). Therefore, Defendant's Motion for Sentence Modification is denied.


### III. Weight of the Evidence

Defendant alleges that the verdicts were against the weight of the evidence. A motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict. Commonwealth v. Widmer, 744 A.2d 745 (Pa. 2000). Thus, the Commonwealth argues that the defendants cannot logically pursue both of these arguments on appeal. (Com.'s Br. p. 6). Furthermore, a motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Commonwealth v. Cousar, 928

---

[17] The "notes of testimony" regarding the Sentencing Hearing will be referred to hereafter as "S.T.".

A.2d 1025, 1035-1036 (Pa. 2007). An appellate court, therefore, reviews the exercise of discretion, not the underlying question of whether the verdict is against the weight of the evidence. Id. at 1036. The fact finder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. Id. The trial court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. Id. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. Id. Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings. Id; see Commonwealth v. Keaton, 729 A.2d 529, 540–541 (Pa. 1999).

In the case *sub judice*, Defendant again argues that the great weight of the evidence supports Defendant's argument that there was no agreement to commit Aggravated Assault upon E.P. and that the verdict at Count 2 was irreconcilably contradictory to, among other things, incontrovertible facts produced at trial. While this Court understands Defendant's argument, this Court is not persuaded by it. The jury heard Defendant testify and Defendant adamantly denied intentionally or accidentally injuring E.P., agreeing with Peterman to do the same, or knowing that E.P. was injured, but failing to seek medical treatment for her. The jury's verdict is not irreconcilably contradictory to the facts produced at trial. The jury found Defendant not guilty of the Aggravated Assault, but determined that Defendant did conspire with Defendant to commit the Aggravated Assault. The jury was certainly capable of determining whether to believe all, part, or none of the evidence with respect to whether the Commonwealth met its burden at each count and to determine the credibility of each witness.

Again, as noted above, Defendant's acquittal on the Aggravated Assault charge did not preclude a conviction for Conspiracy to commit Aggravated Assault in that Pennsylvania law does not require consistent verdicts. Com. v. Tha, 64 A.3d 704, 711 (Pa. Super. 2013).

Based upon this Court's review of the entire record, this Court does not find that the jury's verdict is so contrary to the evidence as to shock this Court's sense of justice. Therefore, this Court does not find that the jury's verdict was against the weight of the evidence.

For the reasons set forth above, the Court enters the Order of Court attached hereto.

**IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA – CRIMINAL DIVISION**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | ) | |
| | ) | |
| vs. | ) | NO.   587 C 2013 |
| | ) | |
| ELIZABETH MAE FAIR | ) | |

## ORDER OF COURT

AND NOW, to wit, this 17th day of August, 2015, for the reasons set forth in the foregoing Opinion, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that:

1.  Defendant's Post-Sentence Motion for Judgment of Acquittal at Count 2: Conspiracy is DENIED.

2.  Defendant's Post-Sentence Motion to Modify Sentence is DENIED.

3.  Defendant's Post-Sentence Motion regarding Weight of the Evidence is DENIED.

BY THE COURT:

_____
Meagan Bilik-DeFazio, Judge

cc:   Judith Petrush, Esq., Assistant District Attorney
Timothy P. Dawson, Esq., for Defendant
District Court Administrator